AGNES EVERETTS, as Administratrix of the Estate of Thomas
Everetts, Deceased, Respondent, v. NORTHERN PACIFIC
RAILWAY COMPANY, a Corporation, Appellant.

ANDREW McNEER, as Administrator of the Estate of A. O. Mc-
Neer, Respondent, v. NORTHERN PACIFIC RAILWAY
COMPANY, a Corporation, Appellant.

(198 N. W. 685.)

**Master and servant — risks incident to patrolling railroad tracks in storm
assumed.**

1. A railroad section crew, one of whose duties it is to patrol the tracks
in time of storm, assume the risks ordinarily incident to the performance of
that duty.

**Master and servant — extraordinary risks not assumed by railroad section
crew patrolling tracks.**

2. While a railroad section crew, one of whose duties it is to patrol the
tracks in time of storm, assume the risks ordinarily incident to the perform-
ance of that duty, they do not assume extraordinary risks, that is, risks which
might be obviated by the exercise of reasonable care on the part of the rail-
road.

**Master and servant — duty of master to warn servant of unusual or ex-
traordinary dangers of employment.**

3. It is the duty of a master to warn his servants of any unusual or extraor-
dinary danger which may arise by reason of their carrying out his instructions
and of which they are unaware.

**Master and servant — railroad not negligent in failing to warn of danger
of floods.**

4. Record examined and *held* not to establish a failure on the part of the
defendant to exercise reasonable care under the circumstances as disclosed.

Opinion filed August 14, 1923.   On rehearing April 18, 1924.

Note.—(1) Employee assumes only risks ordinarily incident to employment, see
18 R. C. L. 676; 3 R. C. L. Supp. 841; 4 R. C. L. Supp. 1200; 5 R. C. L. Supp. 998.
    (3) Duty of master to adopt rules to protect servant, or to warn him against
dangers not reasonably to be apprehended, see notes in 44 L.R.A. 33; 21 L.R.A.
(N.S.) 89; 18 R. C. L. 569; 3 R. C. L. Supp. 825; 4 R. C. L. 1196; 5 R. C. L.
Supp. 992.

Master and Servant, 39 C. J. § 559 p. 441 n. 25; § 602 p. 486 n. 82, p. 488 n. 83; § 895 p. 691 n. 93, 94, p. 692 n. 97; § 926 p. 719 n. 19; § 1284 p. 1092 n. 43.

Appeal from the District Court of Golden Valley County, *Berry, J.*

Actions for damages. From judgments for the plaintiffs, and from orders denying defendant's motions for judgments notwithstanding the verdict, the defendant appeals.

Reversed.

*Young, Conmy & Young,* for appellant.

"Extraordinary or unprecedented floods are floods which are of such unusual occurrence that they could not have been foreseen by men of ordinary experience and prudence. Ordinary floods are those, the occurrence of which may be reasonably anticipated from the general experience of men residing in the region where such floods happen." Soules v. Northern P. R. Co. 157 N. W. 830.

" 'If the accident which occurred was one at all likely to happen,— if it was a probable consequence of a person working about the wheel that he would be caught in it as the plaintiff was,—there would be ground for pressing this argument. But the accident cannot be said to be one which even a prudent man would have been likely to anticipate. . . . So far as there is a duty resting upon the proprietor in any of these cases, it is a duty to guard against probable dangers; and it does not go to the extent of requiring him to render accidental injuries impossible.' " Garraghty v. Hartstein, 26 N. D. 156.

" 'What a man may reasonably anticipate is important, and may be decisive, in determining whether an act is negligent, but it is not at all decisive in determining whether that act is the proximate cause of an injury which ensues. *If a person had no reasonable ground to anticipate that a particular act would or might result in any injury to anybody, then, of course, the act would not be negligent.*' " Garraghty v. Hartstein, 26 N. D. 157; Christianson v. Chicago, St. P. & O. R. Co. 67 Minn. 94, 69 N. W. 640, 16 Am. Neg. Cas. 314.

"The inquiry as to reasonable and probable consequences did not arise in the Daniels Case, but it does arise in actions at common law and under some other statutes in order to decide whether there has been negligence. Even then the question is not whether 'the consequence is a reasonable and probable one,' but whether harm to someone of the

same general kind as that sustained by the plaintiff was a reasonable and probable result of the act complained of, as bearing upon the ultimate question whether there was negligence on the part of the defendant." Re Standard Acci. Ins. Co. L.R.A.1916A, 336.

"The doctrine res ipsa loquitur is inapplicable to cases between master and servant brought to recover damages for negligence." Cryder v. Chicago, R. I. & P. R. Co. 81 C. C. A. 559, 561, 152 Fed. 419; Chicago & N. W. R. Co. v. O'Brien, 67 C. C. A. 421, 424, 426, 132 Fed. 596.

"An injury that results from an act of negligence, but that could not have been foreseen or reasonably anticipated as its probable consequence, and that would not have resulted from it, had not the interposition of some new and independent cause interrupted and natural sequence of events, turned aside their course, and produced it, is not actionable. Such an act of negligence is the remote, and the independent intervening cause is the proximate, cause of the injury. A natural consequence of an act is the consequence which ordinarily follows it— the result which may be reasonably anticipated from it. A probable consequence is one that is more likely to follow its supposed cause than it is to fail to follow it. Chicago, St. P. M. & O. R. Co. v. Kellogg, 94 U. S. 469, 475, 24 L. ed. 256; Hoag v. Railroad Co. 85 Pa. 293, 298, 299, 27 Am. Rep. 653." Cole v. German Sav. & Loan Soc. 124 Fed. 115.

"A master, who, while exercising the care of an ordinarily prudent person, could not be expected to foresee a danger, could not be expected to give warning thereof, and his failure to do so was not actionable negligence." Masterson v. Namquit Worsted Mills, 78 Atl. 259.

"An alleged act of negligence, which would not have produced the injury, but for the interposition of an independent cause which could not have been reasonably anticipated, but which turned aside the natural sequence of events and produced the result, is not the proximate cause of the injury and is not actionable. The intervening cause is the only proximate cause." American Bridge Co. v. Seeds, 144 Fed. 605.

"And, finally, the positive duty of the master does not extend to making or keeping a place reasonably safe, where the work is to make a reasonably safe place dangerous, or an obviously dangerous place safe, as in blasting rocks, tearing down structures and removing super-

incumbent masses. Finlayson v. Utica Min. & Mill. Co. 14 C. C. A. 492, 67 Fed. 507; Gulf, etc. R. Co. v. Jackson, 12 C. C. A. 507, 65 Fed. 48; Florence, etc. R. Co. v. Whipps (C. C. A.) 138 Fed. 13; Moon Anchor Consol. Mines Co. v. Hopkins, 49 C. C. A. 347, 352, 111 Fed. 303." American Bridge Co. v. Seeds, 144 Fed. 613.

"A finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, is not warranted, unless it appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances. Where there is no intermediate efficient cause, the original wrong must be considered as reaching to the effect, and proximate to it." Milwaukee, etc. R. Co. v. Kellogg, 94 U. S. 469–470.

"Where the negligence of one is merely passive and potential while that of the other is the moving and effective cause of the accident, the latter is the proximate cause." Ind. Ice Cream Co. v. United Co. 125 N. Y. Supp. 1106.

"Evidence, as to the alleged defect in the air press on account of certain play or looseness at the points where such press was fastened by bolts to side arms and to the table, examined and held insufficient upon which to base a recovery, it being apparent that such alleged defect could in no manner have caused the plaintiff's injury." Ness v. G. N. R. Co. 25 N. D. 573.

"Where the accident complained of would have occurred, though there had not been any negligence of a person, his negligence is not the proximate cause of the accident." O'Connel v. Missouri P. R. Co. 131 S. W. 117.

"While ordinarily the question of proximate cause is for the jury, where the injury is connected with the alleged negligence only by speculation and conjecture, the question is for the court." Tolin v. Terrell, 117 S. W. 290.

*T. F. Murtha, W. J. Ray, and R. F. Gallagher, for respondents.*

"When the evidence leaves the material facts admitted or undisputed, and when the evidence leaves the material facts and the deductions from them of such a conclusive character that the exercise of a sound judicial discretion would permit the court to give effect to but one verdict, it is its duty to instruct the jury to return it.

50 N. D.—57.

"When there is a substantial conflict in the evidence relating to the material facts, and when fair and rational minds may well draw different conclusions from established facts, the court should submit the issues to the jury." C. G. W. R. Co. v. Roddy, 131 Fed. 712, 65 C. C. A. 470.

"If the facts are in dispute, and there is a conflict in the substantial evidence relative to their existence, or if from the established facts the mind of rational men might well draw different conclusions, it is the duty of the court to submit the disputed issues to the jury. Chicago G. W. R. Co. v. Price, 38 C. C. A. 239, 243, 97 Fed. 427, and cases there cited."

"As between master and servant negligence should be measured by the character and risk of the business engaged in, and the degree of care of all parties is *higher when the lives and limbs of themselves and others are endangered than in ordinary cases.*" 27 Cyc. 1076; Smith v. Baltimore & O. R. Co. (1909) 223 Pa. 118, 21 Am. Neg. Rep. 551; International & G. N. R. Co. v. Penney (1915) — Tex. Civ. App. —, 178 S. W. 970; Pinkerton v. Missouri Pac. (1906) 117 Mo. App. 288.

"If a section foreman was at the place of accident about two hours before it occurred, and at that time the condition of the stream and bridge was such that danger to the track and to the trains moving over it was probable, he should have taken steps to prevent an accident; and the want of knowledge of the present danger on the part of the superintendent of the road was immaterial." Scagel v. Chicago, 83 Iowa, 380, 49 N. W. 990.

"In an action for personal injuries alleged to have resulted from the failure of the master properly to warn and instruct the servant, a recovery can only be had where the master's negligence was the proximate cause of the injury."

It is the duty of the master to warn his servants of new or increased dangers caused by a change in his machinery, appliances, or place or methods of work, and he will be held liable for injuries resulting from his neglect of duty in this respect. 26 Cyc. 1169.

"A railroad company permitting forest debris to accumulate around a bridge, with knowledge of the danger of forest fires, is liable for the death of a fireman killed in the fall of a locomotive through a burning trestle of such bridge, ignited through forest fires."

"A superintendent of a railroad company, being notified by a county road superintendent that a fire was raging on the road, and taking no steps to notify an approaching train, is guilty of negligence, where the locomotive of the train falls through a burning bridge, and the fireman is killed." Bateman v. R. Co. 54 Pac. 996 (Syl.)

"A general warning to an engineer to look out for high water at waterways is not sufficient as a warning that a particular culvert is dangerous." Western R. Co. v. Russell, 144 Ala. 142, 113 Am. St. Rep. 24, 39 So. 311.

"So, mere information given to an engineer in advance that conditions might be bad, without stating or pointing out where the defect was or might be expected, is not sufficient notice to relieve the company of its lack of care and diligence in failing to ascertain and inform the engineer of the location of the particular danger apprehended." Jennett v. Louisville R. Co. 162 Fed. 392.

"Bridges, culverts and the track is a *'place to work'* and a servant does not assume the risk of the master's negligence pertaining thereto." Ry. v. Kemplar, 53 N. E. 931; McCabe v. Wilson (Okla.) 87 Pac. 320; Ry. v. O'Brien, 40 L. ed. 766, 6 of Syl.; Emerson v. R. Co. (Or.) 166 Pac. 946.

NUESSLE, J.   These two actions were brought to recover damages from the defendant company for its alleged negligence resulting in the drowning of two section men while patrolling tracks. The facts in so far as concerns the occurrence of the accident out of which both of the actions grew are identical. By stipulation both actions were tried at the same time on the same evidence and submitted to the same jury. Separate verdicts were returned for the respective plaintiffs, and judgments thereafter entered on such verdicts. The defendant having moved for judgment non obstante in each case on the ground of the insufficiency of the evidence to support the verdict, which motions were denied, now appeals from each judgment and from each order denying its motion for judgment non obstante. In our view of the matter these appeals may be properly disposed of by a determination as to the propriety of the trial court's action in denying the motions for judgment non obstante.

The facts, viewing the record as we must, in the light most favor-

able to the plaintiffs, are substantially as follows: The defendant railway company is a common carrier operating its line in interstate commerce through Billings and Golden Valley counties in North Dakota. The particular division of its line on which the accident in question happened extends from Dickinson, North Dakota, to Glendive, Montana, with division headquarters at Glendive. In June, 1921 A. O. McNeer and Thomas Everetts were in the employ of the defendant as section men. They were a part of a crew of six who worked a section of 6 miles from east of Medora to mile post No. 154, 4¾ miles west of Medora. One Ziegler was the foreman of the crew. The defendant's road west from Medora, crosses the Little Missouri river at Little Missouri, at an altitude of 2,290 feet, and proceeds thence in a westerly direction up the valley of Andrews creek, some twenty miles to Chama, the altitude of which is 2,830 feet. Beach, altitude—2,779 feet, is 5 miles west of Chama, and Wibaux, Montana, is the next station beyond Beach. The stations between Chama and Little Missouri are Sentinel Butte, 4 miles east of Chama and 16 miles west of Little Missouri, at an altitude of 2,731 feet; De Mores, 9 miles east of Chama and 11 miles west of Little Missouri, at an altitude of 2,596 feet; Rider, 15 miles east of Chama and 5 miles west of Little Missouri, at an altitude of 2,405 feet. Thus it will be seen that the average grade of the line from Little Missouri to Chama is 27 feet per mile, and that the average grade from Rider to Sentinel Butte is nearly 30 feet per mile. There was at Little Missouri a section house in which the foreman lived, but no station. There was also a section house at De Mores. The stations at Medora and Sentinel Butte were connected both by telephone and telegraph lines with the division headquarters at Glendive, and the section houses at both Little Missouri and De Mores were on the same telephone connection. There was also a telephone booth near Rider on the same line. The line was so constructed, however, that while communication could be had from any of these telephone points with any of the other points, and one might listen in at any point on the line, yet it was only possible to ring any other point through the division headquarters. Medora and Sentinel Butte had a continuous twenty-four-hour service by telegraph and telephone.

Andrews creek drains a basin extending from Chama eastward to

the Little Missouri. This basin is from 4 to 6 miles wide at Chama, and about the same width at Sentinel Butte and De Mores. The territory west of Chama drains westward into the Little Beaver. The divide runs approximately north and south through Chama. Ordinarily Andrews creek is dry excepting in the spring. Its original bed was very crooked, and between Little Missouri and Sentinel Butte crosses and recrosses the defendant's roadbed many times. In some places these crossings were bridged, and in others the defendant had filled up the old channel with its grade and cut a new one for the creek. The country from Little Missouri to De Mores is very rough, and what is known as Bad Lands. From De Mores to Chama the valley is more level, and more or less under cultivation. There are many heavy cuts and fills here on the defendant's line. The line has been built and in use for thirty-five years, and never before had there been a flood or a serious washout on this section.

Early in the afternoon of June 17th severe rain storms occurred in Montana. These storms travelled from the southwest to the northeast. They were so severe that a washout occurred at Wibaux, and one of the defendant's engines was derailed, blocking both the main and passing tracks. Later in the day and somewhere between 4 and 6 o'clock a very severe rain and hail storm prevailed at Beach, at which point there was a precipitation of almost 4 inches within two hours. The surfacing of the defendant's tracks was washed out there, and the track inundated at places. At about this same time there was a very severe storm both at Chama and at Sentinel Butte. While no gauge measurement of the precipitation was taken, the rainfall at those points in the afternoon was estimated at 4 or 5 inches. At Sentinel Butte the rain continued at intervals until after 11 o'clock, being the heaviest somewhere between 8 and 10 o'clock that evening. These storms were more or less local. The plaintiff's witness, Kelso, was at a point 15 miles north of Sentinel Butte at noon of the 17th, travelling from that point southeasterly to Rider, which he reached at 6 o'clock, and he encountered no rain during that time. However, at noon or shortly thereafter he observed clouds and indications of a severe storm in the direction of Wibaux and Beach, and later on in the afternoon in the direction of Sentinel Butte. There was no rain at Rider until 11 o'clock that night, and very little at Little Missouri. The witnesses are agreed that

the storms which occurred at Beach, Chama and Sentinel Butte during the afternoon and evening were the most violent and the rainfall the greatest that they had ever seen. On the afternoon of the 17th there were also washouts on the defendant's line west of Glendive, and north of Glendive on the Sidney branch. When the washout and derailment at Wibaux occurred, the superintendent of the division, Sloan, was at Mandan. The roadmaster was at Dickinson. He left Dickinson for Wibaux about 5 o'clock in the afternoon with an extra train consisting of a wrecking outfit and crew. He reached Medora about 8 p. m., and continuing on, arrived at Sentinel Butte at 9 p. m. It was then raining very hard. Regular train No. 7 westward bound left Medora at 8:30, arrived at De Mores at 9:20, and at Sentinel Butte at 9:35. Train No. 1 westward bound had in the meantime been held at Beach. When Sloan heard of the washout at Wibaux he at once left for that point with his business car and a light engine. He arrived at Medora about 9:18, and stopped only a very short time to talk with the dispatcher. He then proceeded westward. He was flagged at De Mores by the section boss there about 10 o'clock. He was flagged at the direction of the roadmaster because the conductor of train No. 7 on reaching Medora reported that the water was high in Andrews Creek. It was then raining very hard, and as Sloan was afraid the track might be soft, he left his special at De Mores, and went on to Sentinel Butte with the De Mores section crew by motor car. However, he found that he might have brought his train through safely. It rained hard all the way from there to Sentinel Butte. There was some water in Andrews creek, but not enough to cause concern. He arrived at Sentinel Butte at 10:45. In the Sentinel Butte yards there was water over the track in some places, and it was running through the cut west of there. Sloan at once got into communication with the dispatcher at Glendive, talking with him as to various matters connected with the operations of trains in that division, and as to conditions generally. The telegraph and telephone lines went down about 11 o'clock, and thereafter it was impossible to communicate with any points east of Sentinel Butte. Thus the defendant, through its section men, operators, dispatcher, roadmaster and division superintendent had knowledge of the unusual character and extent of the storms. It had knowledge of the fact that washouts had occurred at various Montana

points, particularly west of Glendive and at Wibaux, of the violent storm at Beach which flooded and washed out the ballast on its road-bed, of the character and extent of the storm at Chama and at Sentinel Butte, and of the fact that Andrews creek was rising and threatening the defendant's road up the valley from Little Missouri.

At about 9 o'clock the dispatcher at Glendive ordered out the Little Missouri section crew, told them that it was raining heavily between Sentinel Butte and Beach, and directed them to proceed westward and patrol the track to De Mores, and to call him when they reached Rider, but gave no warning to them of the unusual character or violence of the storm, or that there was any danger in performing the duty as directed. It was the duty of the section men to patrol the track in time of storm to see that it was in condition, and to look out for wash-outs. Defendant's rule No. 935, regulating the duties of section fore-men and crews, and offered in evidence in the case, provides as follows:

"Track Foremen.

"No. 925. They must closely inspect sections as often as possible; pass over or send one of their men during storms when the road is liable to be damaged, at least once every day or more frequently dur-ing the continuance of storms if circumstances demand; pass or send one of their men over track under their charge, when damage thereto is threatened by storms or unusual conditions, at such intervals as may be specified by the roadmaster or other proper authorities, or that may be necessary to insure safety   .   .   .   Carefully examine road to see if safe for passage of trains. If any place is found unsafe, it must be protected at once by flagman with red signals and torpedoes." The Little Missouri foreman called his crew together and left Little Mis-souri somewhere about an hour after the superintendent's special passed through. It had not rained at Little Missouri, but there were heavy clouds to the west, and it looked threatening. They proceeded westward on their patrol, past mile post 154, which was the west end of their section, and on to the De Mores section, with which they were unfamiliar. Near mile post 152 they encountered a severe rain and hail storm. They took refuge from this storm in a culvert under the track and waited until it had passed, something like half an hour.

There was not much water in Andrews Creek at that time, not enough to run. They then proceeded on their patrol and reached the telephone booth close to mile post 154 near Rider shortly before 12 o'clock. In accordance with directions from the dispatcher, they tried to call him at Glendive, but were unable to do so. As a matter of fact the lines were then down. The operator at Medora was listening in at that time, and Ziegler talked with him but learned nothing of the storm to the west or of the condition as it existed there. They received no warning of there being any washouts. They were looking for broken rails or anything that might be wrong or for water, but they had not been told to look out for water. After leaving Rider they went on for some distance and came to mile post No. 157 where the roadbed cuts through a hill. At that time they saw water coming through the cut just ahead of them. Six or seven rails' lengths back, one of the crew had called Ziegler's attention to the water along the dump. When they saw the water coming through the cut they stopped the car, turned it around, and started back. They proceeded only a short distance to the point where Ziegler's attention had been called to the water along the dump. The water was then running over the track with such force as to stop the car by pressing the wheels against the rails. All of the crew got off the car and endeavored to flee eastward down the track to safety. Ziegler and two of the crew reached a high point on the right-of-way a few rail lengths further on where they remained until morning. Everetts and McNeer and one other of the crew were swept away by the water and perished.

Just about or a little before 11 o'clock after Sloan reached Sentinel Butte, he talked with his conductor, whom he had left at De Mores. The conductor reported that the water was getting high at that point. Shortly after that the lines went down, and it was not possible to communicate with anyone to the east. Sloan sent Youngblood, the De Mores section foreman, back with his crew. They went a little over a mile from Sentinel Butte but discovered a washout and returned. Thereafter and a little after 2 o'clock Sloan himself with the De Mores crew started east. They went as far as they could with their motor, within a mile of De Mores, and walked on to Rider. They found that especially from De Mores eastward a great deal of the line was washed out. The tracks were torn and twisted, and there was every evidence

of a tremendous and irresistible flood. It appeared later that practically fifty per cent of the track between Sentinel Butte and Little Missouri was washed out. This track had been built and in use for nearly thirty-five years, and there had never before been a washout on that section. The testimony shows that this was, with one exception, the worst washout that had occurred during the whole life of the defendant on any of its lines.

These actions were brought to recover damages on account of the deaths of McNeer and Everetts thus occurring. The particular negligence alleged by the plaintiffs on which they base their rights to recover is stated in the respective complaints as follows: "That the defendant knew and should have known that said cloudburst and said great fall of water along its main line between Sentinel Butte and Wibaux would cause a great flood in said Andrews creek, and that in the narrow passages along said creek that said flood would rise many feet above the roadbed and tracks of said defendant; and that the defendant knew and should have known on the night of June 17th, 1921, when it ordered the deceased and other members of said crew to proceed west from Medora along said track in the night time that deceased and other members of said crew would be in imminent danger of being trapped and destroyed by said flood; that notwithstanding this knowledge, the defendant negligently sent the said deceased and other members of said section crew out upon said trip of inspection, and into what defendant knew to be a veritable death trap, without cautioning or warning them; that deceased and the other members of said crew had no notice, knowledge or warning of any kind that said flood was coming or was expected, or that it might occur; and that said deceased met his death because of the negligence of the defendant, its officers, agents and servants in sending the deceased and other members of said crew into said flood without warning." Thus it will be seen that the plaintiffs predicate their cases upon the proposition that the defendant knew or should have known of the conditions that existed along and on the track in question by reason of the storms that had occurred or were occurring; that they knew or should have known of the effects of such storms as regards the running off of the flood water from the Andrews Creek basin, and the floods consequent therefrom in Andrews Creek; that they knew or should have known of the danger that would be in-

cident to the patrolling of the track in question that the Little Missouri section crew were directed to patrol; that notwithstanding, the defendant failed and neglected to warn the section crew and the members thereof of the conditions then existing and the danger incident to the carrying out of the orders thus given to them; that the Little Missouri section crew were wholly ignorant of such conditions and had no means of knowing of the conditions as they existed and would exist, or of the unusual danger incident to the carrying out of the order that had been given them; that as a consequence of such dereliction on the part of the defendant, the deceased met their deaths.

The defendant, on the other hand, maintains that the record does not establish any negligence which was proximately the cause of the accident and deaths; that it acted without negligence in sending out the crew, and did that which any reasonably prudent railroad man would and should have done under the facts as they existed; that the record fails to establish that the defendant knew or ought to have known that that which happened would happen, that the record fails to establish that in sending out the Little Missouri crew as it did, it knew or ought to have known that there was danger of their being injured and killed by flood; that further, the deceased section men assumed the risk of injuries incidental to their duties in patrolling and inspecting the tracks; that the accident and injury occurred by reason of such risk.

In addition to their general verdicts, the jury were required to and did make four certain special findings as follows:

Question No. 1. "Was the duty of patrolling the track in time of storm one of the usual and ordinary risks of the business in which (McNeer, Everetts) was engaged?" Answer: "Yes."

Question No. 2. "Did (McNeer, Everetts) know and appreciate or should he in the exercise of reasonable care have known and appreciated the danger of patrolling the tracks on the night in question?" Answer: "No."

Question No. 3. "Did the officers, agents or employees of the defendant company know or should they by the exercise of ordinary care have known before or at the time of calling the section crew at Little Missouri that the rain which fell would make such a flood of water that

the crew would be in danger of being drowned or injured?" Answer: "Yes."

Question No. 4. "If you answer Question No. 3 'Yes,' should they in the exercise of reasonable care have warned the crew of this danger?" Answer: "Yes."

It will at once be seen, putting aside all other questions, that should question No. 3 be answered in the negative that the motions for directed verdict were good, and the plaintiffs cannot recover. If, therefore, on the whole record, viewing the same in the light most favorable to the plaintiff, there is no room for reasonable men to differ, but all must agree that the answer to this question No. 3 should be "No," the judgment must be reversed and judgment ordered for the defendant.

The decedents, McNeer and Everetts, were section men. A part of their duties was to patrol the tracks of the defendant, especially in time of storms for the purpose of determining the condition of such tracks. They undertook and assumed the risks that were incident to the performance of this duty. Necessarily, when they started out on patrol on the evening of June 17th, even though they had no explicit direction to look out for washouts, they must have known that that was the primary purpose of their patrol. There were indications of heavy storms in the west, and they were advised that it was raining heavily at Sentinel Butte. There surely could have been no reason for their patrol in the westerly direction other than the possibility that the tracks might be soft and that there might be washouts. It was the anticipation that there might be washouts that caused them to be sent. Their duty was born of that anticipation. That being the case, they understood and assumed such risks as might be ordinarily contemplated in the performance of that particular duty. Labatt, Mast. & S. 2d ed. § 1176 and cases cited. And no warning of the dangers ordinarily incident to its performance was required. Thomp. Neg. Vol. 8, §§ 4061 et seq. and cases cited. The defendant owed to them no obligation to have the tracks that they were to patrol safe. They were patrolling the track to make it safe for train crews and passengers who might use the track, and to whom the defendant owed that duty. There was no undertaking on the defendant's part that there should be no danger to the Little Missouri crew. If the track had been wholly safe, and the defendant could have undertaken that there would be no danger, there

would have been no necessity for doing that which they were to do. It was their duty to patrol in time of storm to see that the track was safe. That duty arose because of the possibility that it might not be safe. Therefore, there could be no failure of duty as to them on the defendant's part, or any liability to them for anything which might occur, unless that which should occur were the result of extraordinary conditions of which they had no knowledge, and of which the defendant knew or in accordance with reasonable railroad experience ought to have known or apprehended. But the defendant did owe to them the obligation to exercise reasonable care under the circumstances; that is, while the decedents assumed the risks ordinarily incident to patrolling the tracks in time of storm, they did not assume extraordinary risks, risks which might have been obviated by exercise of reasonable care on the part of the defendant. Labatt, Mast. & S. § 1178 and cases cited; Carlson v. Oregon Short Line & U. N. R. Co. 21 Or. 450, 28 Pac. 497.

Although the risks ordinarily incident to their employment were assumed by the decedents, nevertheless it was the duty of the defendant to warn them of any unusual or extraordinary danger which might arise by reason of their carrying out instructions and of which the decedents were unaware. In this particular case it appears that at the time that they were ordered to patrol the tracks westward from Little Missouri, they were wholly unaware of conditions in the upper end of the Andrews creek basin. It is true that they were advised that it was raining heavily at Sentinel Butte, but no other information was given to them and no warning of any kind. On the other hand, the defendant knew or ought to have known of the storms that had occurred and were occurring, of their unusual violence, and of the extraordinary rainfall; and if it should have known or anticipated that a flood would result therefrom which would endanger the decedents while carrying out its orders, it was the duty of the defendant to warn the decedents of such danger. 8 Thomp. Neg. § 4059; Dresser, Employers' Liability, § 99.

We are, therefore, confronted with the question that was in effect propounded to the jury as question No. 3, that is, should the defendant in the exercise of ordinary care and judgment, in accordance with the requirements of proper and reasonable railroading, have known or anticipated that the flood which did occur would follow? Did it fail to

do that which, under the circumstances and with the knowledge with which it was charged, would have been done by ordinarily prudent and cautious men experienced in that sort of railroad business then in hand? The answer is to be determined, not in the light of after events, not by looking at the consequence and reasoning back to the cause, but in the light of all the experience of the defendant and its agents and officers, by considering the causes and each of them as were known or reasonably should have been known to them prior to the occurrence of the catastrophe. The defendant had operated its line of railroad through the basin and valley in question for many years, through all the varying seasonal conditions. It had never had any washout of any consequence in that territory. It had never experienced anywhere such a flood as occurred. On the one hand, it knew or should have known of the violent storms that were occurring on the afternoon and evening of the 17th of June. It knew of the consequences attendant on these storms west of Glendive, at Wibaux and at Beach. It was concerned as to the condition of its track from Sentinel Butte east. Otherwise, it would not have ordered out the Little Missouri crew. On the other hand, while the rainfall was very great, and while these other washouts had occurred, no rain to speak of had fallen in the lower part of the Andrews creek basin. Almost two hours after the Little Missouri crew were called, and almost an hour after they had started on their patrol, the defendant's trains had safely run over the track in question. At 9 o'clock the wrecking train, bound for Wibaux, had run over the track. A little later, its passenger train No. 7, running on its regular schedule, had run over the track. Its conductor had reported that the water in the creek was rising, but on that particular run had found the track in such condition that his train could and did safely run at higher than the usual schedule. Later still, Sloan, coming in with his special, had seen no conditions to worry about as far as De Mores, to which point he had run his special; and then going further with the same sort of motor that the decedents used, he went on to Sentinel Butte, arriving there at 10:45, and had found no alarming conditions. In fact, the track had been such, in his judgment, as to have safely brought his train over. It is true that when he arrived at Sentinel Butte, he found there had been a very heavy rainfall preceding that time; that it was then raining very heavily; and that the Sentinel

Butte section crew had reported that the water was over the track and coming through the cut along the track to the west of Sentinel Butte. It is also true that, talking with the conductor at De Mores, he learned that the water was rising at Andrews creek and coming up to the section house, but immediately thereafter the lines went down, and from that time on it was not possible to communicate with De Mores or any other point to the east. That being the case, that which occurred after that time cannot be chargeable to the defendant unless there was a dereliction in duty prior to the time when the lines went down and it was no longer possible to communicate with the Little Missouri crew. Respondent argues that even though it was not possible for the defendant to talk with Ziegler and his crew from the west that nevertheless Ziegler did talk later on with the operator at Medora; that if that operator had been directed to advise Ziegler of the condition that he could and would have done so. But it seems to us that if there was occasion for the defendant to advise the operator at Medora to warn Ziegler that the same occasion existed at a time when it would have been possible to have warned Ziegler directly from the west. If the defendant ought to have known that the lines would go down, then, prior to their going down it ought to have directed the Medora operator to warn Ziegler. On the other hand, if reasonably it cannot be said that it ought to have known that the lines would go down, then there was no occasion for giving this direction to the Medora operator.

It seems to us that under the circumstances disclosed in the evidence, viewed in the light of the knowledge possessed by the agents of the defendant, it is not reasonable to say that the defendant should have known that that would occur which in fact later did occur. Neither can it be said that the defendant should have known that there was danger of such a flood as would be likely to injure the section crew or jeopardize their lives. The record contains no evidence from which it reasonably can be said that there was any duty owing by the defendant which was neglected. It is our opinion that fair and rational minds, considering the record in this case in the light most favorable to the plaintiffs, must draw therefrom but one conclusion, which is that the defendant did with respect to the Little Missouri section crew as would have been done by an ordinarily prudent and cautious man under the circumstances disclosed.

It follows that the judgments appealed from must be reversed and judgments of dismissal entered. It is so ordered.

JOHNSON, BIRDZELL, and CHRISTIANSON, JJ., concur.

## Statement.

BRONSON, Ch. J. (dissenting). These two actions were instituted to recover damages from the railway company for its negligence resulting, through flood waters, in the drowning of two section-men, while patrolling tracks. By stipulation, both actions, upon the same evidence, were submitted to one jury. Separate verdicts were returned; in the McNeer Case, $1,000 for plaintiff; in the Everetts Case, designated amounts to the widow and children, aggregating a total of $16,000 for plaintiff. The railway company has appealed from each judgment and from each order denying judgment non obstante. The two actions have been presented and submitted to this court upon one record. Involving similar facts, they will be jointly considered.

The facts are: In June, 1921, the railway company, a common carrier, was operating, in interstate commerce, its railroad through Medora, North Dakota, and Beach, North Dakota. Ed McNeer and Thomas Everetts were then in the employ of the company as section-men. They were a part of a crew of six with one Ziegler as foreman who worked a section of 6 miles on the railroad extending east of Medora and 4¾ miles west to milepost No. 154. The stations between Medora on the east, and Beach on the west, with their respective elevations of the track at each station, and the respective distance of each station from Medora on the east, are as follows: Medora, 2,290 feet; Little Missouri, 2,290 feet, about one mile; Rider, 2,405 feet, 6 miles; Demores, 2,596 feet, 11 miles; Sentinel Butte, 2,731 feet, 16 miles; Chama, 2,830 feet, 20 miles; Beach, 2,779 feet, 25 miles. Little Missouri is not a station; but there was located there the section house, where the section foreman lived, and a coal mine. At this point the Little Missouri river crosses the railroad right-of-way. In the section house at Little Missouri telephone connections existed with the headquarters of the railway division at Glendive, Montana (41 miles west of Beach). Likewise, in the section house at Demores. There was

also a telephone booth near Rider where similar telephone connection could be had with division headquarters; likewise, at Medora and Sentinel Butte similar telephone connections existed with the division headquarters. Through this system of telephones, communication with the division headquarters could be secured from any point. One person, however, could not ring another person on the line except through the division headquarters. Anyone, however, by taking down the receiver could hear telephone communication. Medora had a 24-hour service either through such telephone or by telegraph. This telephone communication was used by section men for reporting, or for giving orders, or securing information from division headquarters at Glendive. There was a chief dispatcher and a trick dispatcher handling trains upon the division concerned covering the places hereinbefore mentioned. Their duties concerned the movement of trains and the conditions of the tracks over which trains were operating. The dispatching was done by telephone when in order; otherwise by telegraph. These dispatchers were concerned with the operations of section crews for purposes of understanding track conditions. There was also a superintendent in charge of the division, and a roadmaster who had authority over section crews and was the superior officer of the chief dispatcher.

Between Medora and Beach the railroad traverses some rough country. At or near Demores it traverses the so-termed "Bad Lands." Generally speaking, from Sentinel Butte, eastward, to Little Missouri the railroad follows the line of Andrews creek which empties into the Little Missouri river. About equi-distant between Beach and Sentinel Butte there occurs a dividing watershed where eastward, waters flow into the basin of, or into Andrews creek and thence eastward until they arrived at the Little Missouri river; westward, the drainage is into Little Beaver creek. From about four miles west of Sentinel Butte where this dividing water-shed exists, waters are drained down the valleys and runs and draw, also into Sentinel Butte creek; all thence into Andrews creek which pursues its course along the track here and there some 15 or more miles until it empties into the Little Missouri river. Ordinarily Andrews creek is dry excepting in the spring. In the construction of the railroad through this territory between Little Missouri and Sentinel Butte the roadbed follows, in a general way,

Andrews creek; here and there it crosses the channel of Andrews creek. In some places filling has occurred; in others cuts have been made. To some extent here and there the channel was changed or obstructed; to some extent, likewise, the track was rip-rapped to protect against washouts. For instance, concerning the character of this construction, one witness testifies that there were some five bridges existing along the track between Demores and Sentinel Butte, a distance of 5 miles. Generally speaking, the evidence and exhibits disclose that the territory traversed is rough territory. A territory where the "Bad Lands" abound. Where it traverses the same, the railroad winds in and out along the Andrews creek basin between buttes, elevations, and rough rolling land characteristic of the "Bad Lands."

According to the testimony of the trick dispatcher, when he came on duty at 4 P. M. on June 17th, 1921, he was informed that an engine had turned over at Wibaux (some 10 miles west of Beach) which tied up traffic. He also mentioned a berry train held at Glendive on account of a washout. About this time the roadmaster was in Dickinson (some 40 miles east of Medora). He was called out between 4 and 5 P. M. on that day to accompany a wrecker and bridge gang westward for purposes of removing the engine at Wibaux that obstructed traffic. He testified that the nature of the damage where the engine was turned over was that the entire grade had washed out where it crossed a small creek that had been filled in; that the engine ran into this, turned over, and blocked the main line on the passenger track. He left Dickinson about 5 P. M. on an extra train consisting of a wrecking outfit, a bridge gang, two or three cars of cinders and a car of ties. He arrived at Medora about 8 P. M. and did not meet any rain. When they reached Sentinel Butte at 9 P. M. it was raining hard. There he talked with the chief dispatcher and advised him that it was raining heavy at Sentinel Butte. In the meantime the Little Missouri section crew, with Ziegler as foreman, had performed their work without encountering rain and finished their day at 5 P. M. at the section house. That afternoon at Beach, North Dakota one witness testified that it started to rain about 2 P. M; thence from 2 P. M. until 5 P. M; thence from about 7 P. M. until 8 P. M; that from 2 P. M. until 8 P. M., it was the heaviest rain he had ever experienced; that there was much water in the streets and the tracks of the railway were under water and the roadbed washed

out for 40 or 50 feet.  Train No. 1, westbound, was held at Beach. Another witness who was working on the Red Trail about 5 miles east of Beach and 4 miles west of Sentinel Butte and, a short distance north of the railroad testified that about 3:30 or 4 P. M. it started to rain; that it rained until about 7 or 8 P. M; that the rain was like a cloudburst; he judged that some 4 or 5 inches of water fell.  From this place, known as Knobb's Hill, the waters on the east side went down the creek and eventually into Andrews creek, and the waters on westerly side, westward and thence into Little Beaver.  Similarly, a civil engineer testified that when he was coming to Beach about 2 P. M. from this work on the Red Trail he struck rain and in Beach that afternoon it rained very hard, the hardest he ever saw; he judged that about 4 inches of water fell; the rain was coming from the West; that Andrews Creek comes as far west as Knobb's Hill and that draws to the north and south feed into it; that the effect of a heavy rain would be to cause the creek to rise very rapidly.  Another witness who was riding on horseback from a distance some 60 miles northwest of Rider to Rider noticed, in the afternoon, appearances of heavy rain towards Beach and westward.  A garage man in Sentinel Butte testified that in the afternoon about 4 P. M. the rain started.  It rained until about 6 P. M.  It was the worst rain he had ever seen in that country.  That it rained again from 8 P. M. until about 11 P. M. or 12 P. M., a still harder rain.  A merchant in Sentinel Butte testified that the rain that afternoon started about 4 P. M; first one lasted until about 6 P. M; the next one started 7 P. M. for a few minutes and then between 8 and 9 P. M. there was a real rain.  The rain in the afternoon before 6 P. M. was the hardest one he ever saw with the exception of the one that occurred after supper.  That this rain was coming from the west and was travelling east down the Andrews Creek valley.  That he never saw water like that before in the streets of Sentinel Butte. It was running over the sidewalks and over the culverts, too.  That the dam in the creek went out.  The keeper of the rainfall records from the United States Department of Agriculture at Beach testified that between 4:15 or 4:20 P. M. and 5:45 P. M. the rainfall, including hail, at Beach was 3.95 inches; after 6 P. M., for the next twenty-four hours, it rained .86 inch.  The rain came from the west and was travelling eastward.  At about 8:30 P. M. the regular westward train, No. 7, left

Medora. It arrived at Demores at 9:20 and at Sentinel Butte at 9:35, where it caught the extra train upon which the roadmaster was proceeding westward. At Sentinel Butte the roadmaster inquired of the chief dispatcher concerning weather conditions east and west. He was informed that it had not rained at Medora but that he, the chief dispatcher, had called out the section-men at Little Missouri to patrol their tracks and start out to see if anything was wrong. Upon being advised by the chief dispatcher that he had not called out the Demores section crew, the roadmaster then, by telephone communication through Glendive to Demores, advised the Demores section men to patrol the tracks east until they met the section crew from Little Missouri. At this time the roadmaster advised the chief dispatcher that it was raining heavy at Sentinel Butte. When No. 7 arrived the roadmaster secured information from the conductor. He was advised that the water was pretty high between Demores and Sentinel Butte; that he had better get out over the track and see if there was any danger of water coming down that way. He testified that water would naturally go that way. In the afternoon of the same day the superintendent of the division, while at Mandan, received word of the engine blocking the traffic at Wibaux. He attached his business car to a light passenger engine westward bound and started west for the purpose of going to Wibaux. He arrived at Medora at 9:18. He stopped there just long enough to talk to the dispatcher. The roadmaster, upon receiving information from the conductor of No. 7, again called up the Demores section house. He knew that the superintendent was coming west. The roade master has charge of the section men on his division. Then he instructed the Demores section crew to wait, flag this special train of the superintendent, and report to him. Then he knew that the superintendent was on his road with a special out of Medora. Before he left he talked with the dispatcher again, in all three times, and advised the dispatcher that it was raining hard. Otherwise he testified that it was the hardest rain he ever saw in the country. The dispatcher also had advised him that it had rained at other points between Wibaux and Beach. Also the roadmaster received advice from the section crews at Sentinel Butte; there were two; one had been west over the track a short distance and found no water running through the cut; they reported that the waters were not running over the track

but were on the side of the track and that they were afraid it might wash out the track. The roadmaster left at 9:45 P. M. and proceeded westward. His train stopped at Chama. There was no washout. He stopped to report to the dispatcher and get any information he could regarding the storm. The superintendent in his evidence testified that he arrived at Medora about 9:18 P. M. He stopped long enough to talk to the dispatcher. He did not stop at the Rider station. He was flagged at Demores by the section crew. There he told the conductor to get on the siding and stay at the phone. With the other men he got on the section motor car and started for Sentinel Butte. He was advised that it was raining hard at Sentinel Butte and he went on west to see the condition of the track. He went westward on the motor car because he did not want to take any chances of tipping over another engine. He did not send the motor car east because he had just come from the east. He had found no washouts and the track was all right. He arrived at Sentinel Butte at 10:45 P. M. It is to be noted that Demores is 5 miles from Sentinel Butte.

The foreman of the Little Missouri section crew testified:—The dispatcher gave orders over the telephone to patrol the tracks between Medora and Demores. He fixed the time about 9 P. M. Otherwise he testified, however, that it was about fifteen minutes after the superintendent's special went through. This special arrived at Medora at 9:18 P. M. He called the crew, got his motor ready and left within an hour. The dispatcher told him to call the dispatcher at Rider and Demores; the dispatcher advised him that it was raining heavy between Beach and Sentinel Butte. He gave no warning in regard to high water and he had none until he met the flood. When they had proceeded upon their patrol trip about to mile post No. 152, they encountered a storm which lasted for about one-half hour. They got in a culvert and remained there until the storm abated. Then they proceeded westward. Their own section ended at mile post No. 154. Near Rider (which is about mile post No. 155) there is a telephone booth. There they stopped. The foreman attempted to telephone to the dispatcher. He could not get the dispatcher over the phone. He talked with the operator at Medora for a few minutes. The foreman told him who and where he was. He learned at that time that there was something wrong with the wires. This was between 11 P. M. and

midnight. They left Rider at midnight westward bound. They proceeded westward a short distance beyond mile post No. 157. There all of a sudden they saw a big volume of water coming down the track in a cut. They stopped the motor car, turned it around, and started back east. Before they had travelled 100 yards, the water became so high that it stopped the engine. The rush of the water was so great that it held the motor speeder against the rails and the men were unable to push it along. Immediately they abandoned the car and sought safety. McNeer and Everetts and another section-man swept from the track and drowned. The foreman with two other men reached a place of safety at a high point a few yards from where the motor car stopped. This place where the accident occurred was a little over three miles west of the section where the Little Missouri crew worked. It was about seven miles from the place where they started, namely, Little Missouri. It was not quite half way between Little Missouri and Sentinel Butte and about 8 miles east of Sentinel Butte.

At this place where the track goes there was a cut about 90 feet through; the sides of the cut were about 15 feet high and the cut about 16 to 18 feet wide. When they saw the water, it was coming down this cut eastward 2 or 3 ft. high.

As a result about 50 per cent of the track was washed out between Sentinel Butte and Little Missouri. The stenographer, within three or four days after June 17th, took kodak views of the roadbed and the damage done between Little Missouri and Sentinel Butte. These views disclose an extensive damage done to the roadbed and to the track. In places the roadbed was seriously washed out, the track carried away off the roadbed, twisted, and torn in many and various shapes. This is particularly evident from milepost No. 156 to No. 159. From Andrews creek bridge, at mile post No. 151, about a mile west of Little Missouri to another bridge about a mile east of Sentinel Butte the track, for a distance of about 13 miles where it generally follows this Andrews creek, had to be rebuilt. Particularly, all the bridges and culverts were washed out. There was some track washed out west of Sentinel Butte.

In the record there is evidence through the testimony of the dispatchers, the operator at Sentinel Butte, the roadmaster, the superintendent and others, to the following effect:—After the dispatchers came on

duty at 4 P. M., the operators at Wibaux, Beach, and Sentinel Butte kept informing them of the storm and its extent; during the afternoon, they received reports of the storm from different points along the division both east and west of Glendive; they knew about the washout and derailment at Wilbaux; the section crew at Beach were out when they came on duty at 4 P. M. At 3:30 P. M., 5:30 and 5:45 P. M., the dispatchers were notified concerning the storm by the operator at Sentinel Butte; they received reports of no rain at Medora; before 9 P. M. they knew that both section crews at Sentinel Butte were out; the chief dispatcher called out the Little Missouri crew because of hard rain reported at Sentinel Butte and no rain at Medora; he wanted to be sure that the track was covered; this was three or four minutes before the roadmaster talked to him. He did not call the Demores crew because he had not gotten around to it; when the roadmaster called, the roadmaster said that he would send out the Demores crew. Between 9 P. M. and 9:30 P. M. both the dispatchers and the roadmaster knew that the heaviest rain and most severe storm ever experienced was in progress at Sentinel Butte and was proceeding eastward. The roadmaster knew that the water was getting pretty high around the bridges between Sentinel Butte and Demores. About 10 P. M. when the superintendent arrived at Demores, he knew that there it was raining very hard. There he left his special, by way of precaution that another engine might not be tipped over, and proceeded westward with the Demores crew by motor car. Then No. 7 was at Sentinel Butte, 5 miles distant, and the roadmaster's wrecker had just previously left for Chama and Beach. Around 11 P. M. the lines went down; the accident occurred after midnight.

One of the Little Missouri section crew testified that they received no warning of there being washouts; as they were patrolling the tracks, they looked for broken rails or anything that was wrong, or for water, although they were not warned to look out for water; after they came to mile post No. 157, where the track goes through a cut in the hills, they saw the waters coming just a short distance ahead of them; they stopped the car, turned it around and started back. They proceeded only a short distance; the waters stopped the car; the water was over the track then; he and Everetts got off the west end of the car; Everetts was ahead of him; he went down between the ties; he pulled him out;

the ties gave way and then both went down; the witness caught the rails with his hand and finally got out; he heard Everetts calling for help.

Another of the Little Missouri section crew, as a witness for the railway company, testified that, as he was riding on the motor car in front at this place west of Rider with a lantern in his hand, he saw the water along the dump there; he exclaimed "What is it?" the foreman said "We will go on a little further;" then they must have travelled six or seven rail-lengths after that; then the car stopped; they went right back; when they got back the water they saw there was just crossing the track; the water was making a noise; he saw one man caught in the flood; he reached a little high piece of land where he stayed, with the foreman.

The action in the Everetts Case was instituted by the widow, as administratrix, to recover damages, under the Federal Employers' Liability Act, for the negligence of the railway company in failing to warn the deceased and to stop the motor car after the flood was observed. Likewise, in the McNeer Case, a similar action was instituted by the administrator of the estate. Thomas Everetts left surviving him a widow and three minor children. In the McNeer Case the deceased was forty-four years old at the time of the drowning. His mother, resident in Illinois and sixty-eight years old, testified that her son married in 1878 (the time is evidently a mistake); that he was single when he died; that her son never had any children and that his wife married again; the deceased son left no children surviving him. Further, she stated in a general way that during the three or four years before the death of her son he contributed to her support about $700 or $800.

By stipulation special questions were submitted to the jury orally. The court had prepared a written charge. The special questions were submitted later. Accordingly, it was stipulated that the instructions with reference to the special questions might be given orally. In the Everetts Case the jury returned a general verdict for the widow of $4,000, to one son $3,000, to a daughter $4,000, and to another son $5,000. In each case the special questions submitted were similar. They were presented and answered as follows:—

"Question No. 1. Was the duty of patrolling tracks in time of

storm one of the usual and ordinary risks of the business in which Thomas Everetts was engaged? Answer: Yes.

"Question No. 2. Did Thomas Everetts know and appreciate, or should he in the exercise of reasonable care have known and appreciated, the danger of patrolling the tracks on the night in question? Answer: No.

"Question No. 3. Did the officers, agents or employees of the defendant Company know, or should they by the exercise of ordinary care have known, before or at the time of calling the section crew at Little Missouri, that the rain which fell would make such a flood of waters that the crew would be in danger of being drowned or injured? Answer: Yes.

"Question No. 4. If you answer question No. 3 'Yes,' should they in the exercise of reasonable care have warned the crew of danger? Answer: Yes."

## Contentions.

The railway company maintains that no negligence is shown in the record which proximately caused the loss and injury; that the storm was unusual and unprecedented; that the company was not negligent in sending out the crew but did what any reasonably prudent railroad man would have done; that the evidence is wholly insufficient to establish that defendant knew or ought to have known, when the men were called out, that a great flood would occur in Andrews creek so as to place the crew in danger of being trapped and destroyed by such flood; with reference to the McNeer Case, that the evidence discloses that the deceased McNeer was a married man and there is no competent proof of his divorce so as to permit recovery of damages in behalf of his mother; that, upon the record and under the Federal decisions concerning the Federal Employers' Liability Act, the deceased sectionmen assumed the risk of injuries pursuant to their duties requiring them to patrol and inspect tracks; that the court erred in charging the jury that ordinary care is such as people usually exercise about their own affairs of ordinary importance, and permitting the jury, under this broad charge, to find negligence, pursuant to the allegations of the complaint, which were broader than the proof submitted. Complaint

is also made that the court erred in instructing the jury to the effect that the failure to warn the Little Missouri crew of danger through the rains would constitute negligence, on the ground that it permitted the jury to consider rainfall in territory out of the Andrews creek basin. Error is also predicated in refusing to give requested instructions concerning negligence, proximate cause and the intervention of an efficient, independent producing cause.

## Decision.

The record facts are involved and, to some extent, in dispute. Whether the defendant was free from negligence, as a matter of law, in its instructions and warning given to the deceased section men is the doubtful question.

Upon general survey, the record facts reveal an unusual storm, in intensity and continuance, in the Andrews creek basin during the afternoon and evening of June 17th, 1921. As a result, ordinarily dry draws, runs, and creeks became avenues of torrential waters and floods. For a space of about 16 miles the railroad track follows, generally, the Andrews creek basin. In this stretch of territory, the topography of the country is unusual. Part of this territory is known as the "Bad Lands." In this traverse of territory, from Rider west to the Divide near Chama, about 13 miles, the track ascends about 400 feet. In construing its railroad through these "Bad Lands" numerous cuts and fills have been made, numerous bridges and culverts constructed. At places, the right-of-way crossed here and there the channel of Andrews creek. As the road traversed its way through these "Bad Lands," buttes or hills in various rough forms arose out of this basin. Rough draws and runs existed where a storm of any unusual character would naturally create a rapid run-off of water with torrential results. Thus, by construction and existing conditions in these "Bad Lands" there existed a section where, through the topography of the country, excessive floods might cause extensive washouts, when unusual and severe rains occurred. A situation was presented upon the facts where, upon a given rainfall, an extensive flood with great resultant damage through the rapid flow of the waters in the Andrews creek basin might occur, as it did occur. In the aftermath it is not difficult to un-

derstand, as a matter of mathematics, how the serious damage that did result would occur from the construction that was made in the Andrews creek basin through the rainfall that happened. True it is that never before had the railroad in this basin experienced any such damage or anything like such washouts: True it is that with one exception the evidence fairly shows that this was the most intense flood with extensive washing out of the tracks that had occurred on the system for some twenty-five or more years.

Accordingly, in view of the topography of the country as related, in the manner that the track was constructed, taken in connection with the unusual rain storms that occurred on June 17th, the legal questions are presented: (1) Did the railroad company become cognizant of the unusual character and severity of this storm at a time when it called out the Little Missouri crew or at a time when it could have communicated with such Little Missouri crew? (2) Under all the circumstances, was the railroad company chargeable with the understanding that excessive washouts with attendant floods might occur to its tracks and roadbed? (3) Did the railway company fail to exercise reasonable care in instructing the members of the Little Missouri crew who lost their lives in the performance of their duties? (4) Did these members of the Little Missouri crew who thus perished assume the risk?

(1) I am of the opinion that the evidence is sufficient to warrant the finding of the jury that the railroad company knew and realized the unusual character of this storm. The very efforts that the railroad company was making on the afternoon of June 17th anticipatory of damage or washouts serves to verify the fact of realization. When the chief dispatcher came on the job at 4 P. M. on the afternoon of June 17th, storm conditions to the west were presented to his attention. The storm came from the west. Trouble was being experienced on the line to the west. At Wibaux a washout had occurred. The storm was proceeding to the east. The severity of the storm at Beach became apparent in the afternoon. He received reports during the afternoon of the storm along the line. There is evidence in the record of a more severe storm that occurred between Beach and Sentinel Butte and at Sentinel Butte in the afternoon of June 17th. The rain waters from this storm, as witnesses testify, would naturally create a condition of high

water in Andrews creek as this creek had to receive the waters from Chama east, from the draws, runs and the water shed to carry the same into the Little Missouri. As the day progressed it is evident that the railroad company, realizing the intensity of the storm and its possible effect, had its section crews out in the territory immediately concerned, even after their day's duties had been performed. Just prior to 9 P. M. when the call was made for the Little Missouri crew to proceed to patrol the tracks, the rainfall conditions in the territory to the west of where the Little Missouri crew were now situated was known to the chief dispatcher. The storm was progressing eastward. Its intensity at Sentinel Butte and westward he knew. Furthermore, this was not a local storm or a local matter; the roadmaster of the division and the superintendent of the entire division were alert and actively concerned. One proceeded westward to the territory on a wrecking extra; and the other, by a special train; all section crews in the territory affected were out and frequent reports were being made along the line to the dispatchers. The storm was progressing eastward; as it progressed, it left immediately behind a trail of high water conditions, actual or prospective washouts, and delayed or interrupted train service. At Wibaux washout conditions had caused derailment of an engine. At Beach train No. 1 was held; at Chama eastward, in the afternoon, incipient torrential floods were in progress; at Sentinel Butte, track crews were out and reports of water along the tracks westward likely to produce washouts were given; at Sentinel Butte the wrecker extra stopped and the roadmaster, instead of proceeding westward to clear the track at Wibaux, as was his purpose at the beginning, took charge of the situation; he told the Demores crew to meet the Little Missouri crew; he waited for No. 7 to arrive; he learned further conditions from the conductor of No. 7; he countermanded the order to the Demores crew and ordered them to wait and flag the special of the superintendent; No. 7 was held at Sentinel Butte. All of these facts were sufficient, in my opinion, to warrant the finding of the jury that there was a realization and understanding on the part of the railway company of the unusual severity of this storm.

(2) During this same afternoon of June 17th, and before he called out the Little Missouri crew, the chief dispatcher knew that damage had been done in the west by this storm which had proceeded eastward;

a washout had occurred at Wibaux only 10 miles west of Beach; excessive waters were around the tracks at Beach; at Sentinel Butte, the unusual severity of the storm was reported as well as high water and possible washouts. The roadmaster, who in the afternoon was at Dickinson, and who was the superior officer of the chief dispatcher as well as the man in charge of all the section crews, becoming aware of conditions, proceeded with a wrecking crew over this territory to reach Wibaux and clear the line. The superintendent of this division, who in the afternoon was at Mandan, becoming aware of conditions, attached his business car to an engine and started westward. Before the Little Missouri crew left on the trip to patrol the tracks, around 10 P. M. (as the jury might find), the roadmaster, having arrived at Sentinel Butte, knew that a most unusual and severe storm was in progress; that washout conditions might occur east and west of Sentinel Butte. He knew, further, then, that the Little Missouri crew had been ordered out. Then he, instead of the chief dispatcher, ordered the Demores crew to proceed eastward and meet the Little Missouri crew. If this had been done the drowning here involved never would have occurred; but soon after 9:30 P. M. No. 7 arrived. The rain conditions, through report of the conductor on No. 7 intensified the necessity of attention to the track and washout conditions. The order to the Demores crew was countermanded and they were instructed to stop the superintendent of the division at Demores; and so, when the superintendent arrived, he ceased to proceed with his special train; by way of precaution, he held this special at Demores to avoid the possibility of another derailed engine. He embarked on the motor car to proceed westward from Demores to Sentinel Butte; and thus, in a distance of five miles about an hour was consumed in traversing the same. So I am of the opinion that the evidence was sufficient to warrant the finding of the jury that the railroad company, under all the circumstances, realized and understood that peculiar and excessive washouts to the track with attendant floods might occur.

(3) The Little Missouri section crew, during the day of June 17th, had not experienced storm conditions. When they were called out by the dispatcher they were told to patrol the tracks, as it was their duty so to do, westward past Rider to Demores and to report at telephone stations to the dispatcher. This order required them to go off their

own section. Never before had they been, so far as the record discloses, off their own section to do such patrol duty.

There is no showing in the record that this crew or the deceased section-men were familiar with this track or conditions, off their own section. When called, it was not raining at Little Missouri; the section foreman testifies that the dispatcher told him that it was raining heavy between Sentinel Butte and Beach; but this information concerned a territory which commenced 5 miles west of the western terminus of the section which the crew were requested to patrol. Further, he testifies that the dispatcher gave him no warning of high water. Another member of the crew testified that they received no warning to look for water nor of washouts. Yet, it was a part of their duty to look for water upon, or washouts in, the track. But, what knowledge did they possess so as to be forewarned, not only of danger and damage to property, concerning which they had an active duty to perform, but also to themselves and their lives. The section foreman was not a foreman in name only. He had an active duty and responsibility not only through inspection, report, and section-men's duties to safeguard railroad employees, property and lives of passengers, and freight, but also a duty and responsibility to protect the men under his charge. Over his men, he was as much a foreman, as was the superintendent when proceeding with his section crew westward from Demores. All of the other foreman agencies of the railroad sought to inform themselves and to give to each other all of the information procurable as to the extent of the storm and the possibilities of damage and destruction. The roadmaster, possibly weighing chances of high water upon the track, washout conditions, and possible injury to the person of the superintendent and his men, coming west on a special, or damage to the train, decided to warn the superintendent and to require the Demores crew to flag his train. Thus the warning of conditions that would have been conveyed by the Demores crew to the Little Missouri crew was shifted from them to the superintendent. The railroad officials in charge had particular means of acquiring knowledge concerning conditions; the very intensity and volume, its widespread character, intensified that knowledge. Commanding officials, with years of experience behind them understanding possibilities of floods and washout conditions, were bound to appreciate, as they did appreciate

by their activities and direct supervision, flood conditions and dangers therefrom. The warning given by the dispatcher was merely a general warning, if any at all. He could have more fully warned them when he first called. He could have warned them after he talked with the roadmaster and before the crew left on their patrol. The roadmaster, who took charge, likewise could have warned them. So, the superintendent might have done. Must this court assume, as a matter of law under the circumstances, that there was on duty imposed upon these officials to so advise and instruct these section men about the risk and the possible dangers, that they might appreciate what they were about to encounter and might know how to prepare for and avoid dangers, apparent from the unusual circumstances, existing? 4 Thomp. Neg. § 4055, id. vol. 8, § 4059; Dresser, Employers' Liability, § 99; Louisville & N. R. Co. v. Peck, 152 Ky. 6, 49 L.R.A.(N.S.) 198, 153 S. W. 39; Western R. Co. v. Russell, 144 Ala. 142, 113 Am. St. Rep. 24, 39 So. 311; Chicago G. W. R. Co. v. Roddy, 65 C. C. A. 470, 131 Fed. 712.

Considering all of the circumstances, I am of the opinion that the minds of ordinary men might reasonably differ upon the question whether the Company negligently failed to give proper warning and, therefore, the finding of the jury should not be disturbed.

(4) Upon these facts and circumstances, I am clearly of the opinion that the question of whether or not these section men assumed the risk was for the jury.

In response to the contention of the railroad company that the storm was so unusual and unprecedented as to constitute an intervening, independent cause by act of God, occasioning the loss and damages sustained, the answer must be made, in my opinion, that the railroad company, under all the circumstances, became cognizant of the character of this storm in sufficient time, pursuant to the finding of the jury, to have warned and instructed the Little Missouri section crew concerning the same and, thus the negligence of the defendant in this regard became the proximate cause of the loss and injuries resulting. The record is sufficient as far as the McNeer case is concerned, to uphold the finding of the jury that the deceased McNeer was a single man at the time of his death and that, therefore, his mother is entitled to recover.

I am further of the opinion that, pursuant to the special questions submitted to the jury by stipulation of counsel, and the oral instructions given with reference to the same, that no prejudicial error occurred through the trial court's instructions concerning negligence, or its refusal to give instructions requested by the Company. Each of the judgments should be affirmed with costs.

On petition for rehearing.

NUESSLE, J. On petition of the respondents herein, a rehearing was ordered. At such rehearing the case was fully reargued by counsel. We have given the whole matter further and careful consideration, but we can see no reason for receding from our original opinion. Therefore, the order heretofore entered reversing the judgments of the trial court and dismissing the actions will stand.

BIRDZELL, CHRISTIANSON, and JOHNSON, JJ., concur.

BRONSON, Ch. J. (dissenting). I adhere to the dissent heretofore filed.